801 F.2d 608
 58 A.F.T.R.2d 86-5846, 55 USLW 2199, 86-2
USTC P 9690
 HARTWICK COLLEGE, Aurelia Osborn Fox Memorial Hospital
Society, and Railroad and Local Young Men's
Christian Association of Oneonta, N.Y.,
Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 1170, Docket 85-6342.
 United States Court of Appeals,
Second Circuit.
 Argued April 4, 1986.
Decided Sept. 18, 1986.
 
 Michael J. Roach, Tax Div., U.S. Dept. of Justice, Washington, D.C. (Michael L. Paup, Richard Farber, Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., Roger M. Olsen, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., Frederick J. Scullin, Jr., U.S. Atty. for N.D. N.Y., Syracuse, N.Y., of counsel), for defendant-appellant.
 James M. Reilly, Albany, N.Y. (Jacob H. Herzog, Herzog, Nichols, Engstrom & Koplovitz, P.C., Albany, N.Y., of counsel), for plaintiffs-appellees.
 Before MANSFIELD, CARDAMONE and PIERCE, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 This is an appeal from an order of the United States District Court for the Northern District of New York, Neal P. McCurn, Judge, granting the plaintiffs a refund of taxes paid on income earned by the estate of Jessie Smith Dewar during the period from May 28, 1976 through April 30, 1977. After the income tax was paid, appellees filed this tax refund suit on behalf of the estate subsequent to the executors of the estate having been duly discharged in the Surrogate's Court of Otsego County, New York, for all purposes except the filing of amendments to the estate's state and federal fiduciary income tax return and the subsequent filing with the Surrogate's Court of a supplemental accounting with respect to these amended tax filings. Appellees are charitable organizations under the Internal Revenue Code of 1954 ("IRC"), 26 U.S.C. Sec. 170(c) and residuary legatees of the estate. Appellees have claimed that the estate was due a refund, under IRC Sec. 642(c), for amounts "permanently set aside" for them as charitable organizations.
 
 
 2
 After the district court issued decisions holding that the appellees had properly filed for the refund, 588 F.Supp. 926, and that the estate could take a deduction under IRC Sec. 642(c), the parties were still unable to agree as to the amount of the deduction available to the estate. The gravamen of this remaining dispute was whether the income tax deduction allowed the estate under IRC Sec. 642(c) was required to equal the amount to be received by the charities once income taxes were paid or the amount "permanently set aside", pre-tax, under the terms of the will. The district court ruled that the pre-tax amount provided the appropriate basis for the deduction. 611 F.Supp. 400. The government appeals this ruling and, in addition, challenges the subject matter jurisdiction of the district court to hear this case on the ground that the appellees had not exhausted their administrative remedy before the Internal Revenue Service ("IRS"). We reject both of the government's challenges and affirm the rulings of the district court.
 
 BACKGROUND
 
 3
 On May 28, 1976, Jessie Smith Dewar died testate leaving an estate of approximately $49 million. Her will established the following priorities for distribution of the estate. First in priority were "all ... debts and funeral and administrative expenses." Further, "all inheritance, estate, transfer, succession and death taxes" were specifically directed to be paid out of the "general estate as expenses of the administration thereof." Following in priority were several specific individual bequests. Finally, the will directed that the residuary estate be apportioned among the appellees and two additional charitable organizations.
 
 
 4
 On June 8, 1976, the last will and testament of the decedent and a codicil thereto were admitted to probate in the Surrogate's Court of Otsego County, New York. Rutson R. Henderson, Wendell F. Couse and Charles H. Bissell were designated to serve as co-executors of the estate.
 
 
 5
 On August 19, 1977, the co-executors filed a Fiduciary Federal Income Tax Return (Form 1041) with the IRS for the period May 28, 1976 through April 30, 1977. The return reported a total income of $3,583,840 and various deductions and exemptions totaling $1,752,775 resulting in a taxable income of $2,431,065. The executors took no deduction for amounts permanently set aside for charitable purposes. The income tax liability, which was paid with the return, totaled $1,728,879.
 
 
 6
 In November 1978, the co-executors filed a final accounting and petition for judicial settlement of the account with the Surrogate's Court. The appellees filed objections to this accounting claiming that the co-executors had failed to claim a charitable income tax deduction to which the estate was entitled under IRC Sec. 642(c) and had thereby overpaid the income taxes of the estate. On December 29, 1978, Surrogate Robert A. Harlem ruled that, since the possibility was more than negligible that income taxes would consume the remainder of the estate and eliminate the charitable gift, "the court [was] not constrained to direct the fiduciaries to file amended income tax returns with respect to income earned during the course of administration to claim a charitable deduction."
 
 
 7
 In the same ruling the surrogate granted appellee Hartwick College's motion to compel the executors to take a deduction on the fiduciary income tax return for estate taxes paid during the administrative period. In all other respects, however, the surrogate accepted the accounting of the co-executors, subject to revision by a subsequent accounting to reflect submission of amended fiduciary income tax returns to claim the deduction for estate taxes paid. At this point, the co-executors were discharged for all purposes except the filing of the revised return and the submission of this additional accounting.[1] The co-executors filed the amended federal tax return, and included $330,208 in additional deductions and $35,774 in additional income, on July 17, 1979. On February 16, 1981, the IRS issued a refund of $189,557 to the estate, representing the allowance on the additional deductions claimed.
 
 
 8
 On March 5, 1980, after the co-executors had filed the amended return but before the IRS had issued the refund, the IRS received another amended return on behalf of the estate, signed by Philip S. Wilder, Jr., the president of appellee Hartwick College. This return claimed an additional charitable deduction under IRC Sec. 642(c) in the amount of $2,431,765 which reduced the taxable income of the estate to zero and supported a refund of the $1,728,879 in income taxes previously paid by the estate.
 
 
 9
 On August 11, 1980, an attorney for the estate informed the IRS that the amended return signed by Wilder was not filed at the direction or with the authorization of the representatives of the estate and that the estate was not seeking a refund based upon a claimed charitable deduction. Thereafter, the IRS took no action to allow or deny the purported claim for refund filed by Wilder.
 
 
 10
 Six months later, appellees filed this tax refund suit in the United States District Court for the Northern District of New York. Appellees claimed that each of them was a residuary legatee of the estate, that as such they were qualified to file a suit for refund because the accounts of the co-executors of the estate had been judicially settled and the co-executors discharged as to the issues raised in the complaint. Appellees also alleged that the tax returns filed by the co-executors on behalf of the estate for the period of administration were incorrect and that the estate was entitled to a charitable deduction in an amount equal to the entire income of the estate. Since they claimed the entire income of the estate as a deduction, the resulting tax liability alleged in the complaint was reduced to zero. Therefore, appellees sought a refund of the entire amount of income taxes paid.
 
 
 11
 In December 1981, the government filed a motion to dismiss the complaint pursuant to Rule 12(b)(1) of the Fed.R.Civ.P. challenging the court's jurisdiction to hear the case. The government claimed that the appellees were not the proper parties to file the claim for a refund under IRC Sec. 7422. The district court found that Revenue Ruling 73-266, 1973-2 C.B. 408 allowed residuary legatees to file tax returns on behalf of the estate where the executors have been discharged and the final accounting has been rendered. The district court ruled against the government holding that, since the co-executors had been discharged as to the issues raised by appellees, the circumstances of this case met the basic requirements of IRS policy as expressed in the Revenue Ruling.
 
 
 12
 On May 15, 1984, Judge McCurn granted the appellees' motion for partial summary judgment on the issue of whether the estate could claim the charitable deduction under IRC Sec. 642(c). The government moved to have the judge reconsider his disposition of the motion for partial summary judgment on the ground that the issue had been precluded or collaterally estopped by the surrogate's previous determination of the same issue. On May 31, 1984, the district court issued its decision denying the government's motion for reconsideration on the ground that the Surrogate's Court was without jurisdiction to decide the matter. 588 F.Supp. 926. In addition, the district judge indicated that he intended to refer the matter of the exact calculation of the deduction to be allowed under Sec. 642(c) to a special master, after finding that "the amount of the estate income which was 'permanently set aside' for charitable purposes was not the entire $2.4 million reported as 'taxable income' on the fiduciary return, but only the amount that the residuary beneficiaries would have received but for the income tax." Subsequently, the parties requested the court to withhold (or defer) appointment of a master to afford them an opportunity to reach a mutually agreeable calculation on their own. This effort resulted in a disagreement over whether an "interrelated computation"[2] ] or a "straight deduction"[3] method should be used to calculate the charitable deduction allowable under IRC Sec. 642(c). On February 25, 1985, Judge McCurn resolved this dispute in favor of a "straight deduction" method. The government now appeals this ruling as well as the district court's denial of its motion to dismiss the complaint under Rule 12(b)(1) of the Fed.R.Civ.P.
 
 DISCUSSION
 
 13
 I. Jurisdiction of the District Court.
 
 
 14
 We reject the government's claim that the district court lacked subject matter jurisdiction over this case. The jurisdiction of a federal district court in a tax refund suit is governed by 28 U.S.C. Sec. 1346 and IRC Sec. 7422(a). Section 1346 grants jurisdiction to federal district courts with respect to actions against the United States "for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected." However, Sec. 7422(a) of the IRC conditions the jurisdiction of the court in such cases upon "a claim for refund or credit [having been] duly filed with the Secretary." (emphasis added). The government claims that appellees did not duly file their tax return for two reasons: (1) because the appellees were not authorized to file a tax return on behalf of the estate, and (2) because the appellees did not submit documentary proof of their authority to act on behalf of the estate with their claim as the government contends is required by Revenue Ruling 73-366, 1973-2 C.B. 408.
 
 
 15
 As a general rule, the claim for refund required by Sec. 7422(a) must be filed by the taxpayer claiming such refund. See 26 C.F.R. Sec. 301.6402-2(a)(1). However, where the taxpayer has died, a tax return or a refund claim may be filed on his behalf by his legal representative. See 26 C.F.R. Sec. 301.6402-2(e). As the district court noted Revenue Ruling 73-366 identifies circumstances under which the proper party to file a claim for credit or a refund may be someone other than the taxpayer's legal representative. The revenue ruling discusses some hypothetical situations where others might appropriately file, stating in pertinent part:
 
 
 16
 Situation 2. Subsequent to the distribution of an estate's assets, rendering of the final accounting, and discharge of the executor, it was discovered that the executor had overpaid the estate's Federal income tax. Under the terms of the decedent's will, the estate's Federal income tax liability was required to be paid from the residuary estate. However, the residuary estate was not sufficient to satisfy the estate's Federal income tax liability and, under state law, specific legacies to other beneficiaries had to be reduced either in whole or in part.
 
 
 17
 Situation 3. The facts are the same as in situation 2, except that the residuary estate was sufficient to satisfy the estate's Federal income tax liability.
 
 
 18
 Revenue Ruling 73-366, 1973-2 C.B. 408. The present case falls within the purview of "Situation 3." But for the fact that the co-executors herein were retained for the limited purpose of filing an amended tax return and to submit an accounting as to the outcome of the new tax return, the situations would be identical. In our view, these differences do not provide a sufficient basis for distinguishing the instant case from "Situation 3."[4]
 
 
 19
 The agency's position with respect to the revenue ruling is that "the residuary legatee is the proper party to file a claim for credit or refund." It also directs that "the claim for refund or credit should show the decedent's date of death and be accompanied by a certified copy of the court order granting the discharge of the executor and a certified copy of the order of distribution." Id. (emphasis added). We interpret this ruling as reflecting an agency policy under which the appellees would be the proper parties to file for the refund but should have submitted some documentation of their status. The use of the permissive term "should" suggests that the agency's policy does not mandate such proof and would not support the dismissal of this case absent such proof. For these reasons, we affirm the district court's assertion of jurisdiction herein.
 
 
 20
 II. Method for Calculating Deduction.
 
 
 21
 As to the dispute over the appropriate method for calculating the deduction due the estate, the gravamen of the dispute is whether a deduction for a residuary donation permanently set aside for charitable purposes must be reduced to reflect an anticipated tax liability. The appellees assert, and the district court agreed, that the deduction should be equal to the amount of money remaining in the estate prior to the payment of taxes and that the amount actually received by the charities should be reduced to cover the tax liability. We agree.
 
 
 22
 Specifically, the estate had roughly $2.4 million of taxable income during the year in question. One million dollars of this income had been used for administrative expenses and deducted on the estate tax return and, therefore, was not deductible for purposes of income tax. As a result, $1.4 million in cash remained in the estate. The appellees contend that this entire amount should be reflected on the income tax return as the charitable donation deduction. Since there was $1 million of non-deductible expense and the applicable tax rate was 70%, if the $1.4 million were allowed as a deduction there would remain a tax liability of $700,000 for the year in question.
 
 
 23
 Under the appellees' suggested approach, we need go no further: the deduction should be for $1.4 million, the government should receive $700,000 in taxes and the appellees should receive the remaining $700,000. The government's claim is that as a basic principle of taxation no deduction for charitable donations can include money used to pay taxes, and, therefore, since only $700,000 would be available as a charitable donation after payment of the known $700,000 tax liability on the $1 million in income that went to administrative expenses, only $700,000 may be deducted. Further, the government argues that as the deduction is reduced, more taxable income is exposed and more tax must be diverted from the residuary legatees. The government contends that, since the deduction may not include money used or to be used to pay taxes, the appropriate deduction may be no more than money to be actually donated. By recalculating the deduction in this iterative fashion it becomes clear that the only point at which the deduction would include no taxes is where the deduction is equal to zero.[5]
 
 
 24
 Therefore, two alternatives are apparent, a deduction of $1.4 million or no deduction at all. The determinative issue is whether the deduction under IRC Sec. 642(c) is required to reflect only the amount actually donated to a charitable organization excluding money that ultimately will be used to pay taxes.
 
 
 25
 Section 642, entitled Special Rules for Credits and Deductions, provides in pertinent part:
 
 
 26
 (c)(2) Amounts Permanently Set Aside--
 
 
 27
 In the case of an estate ... there shall also be allowed as a deduction in computing its taxable income any amount of the gross income, without limitation, which pursuant to the terms of the governing instrument is ... permanently set aside for a purpose specified in section 170(c)....
 
 
 28
 Although this language clearly allows a deduction of "any amount of the gross income, without limitation ... pursuant to the terms of the governing instrument" (emphasis added), the government argues that an overriding principle of taxation precludes the inclusion within a deduction category of any amount eventually paid as taxes of the estate.
 
 
 29
 The issue of the appropriate regard to be given such espoused "principles" in the interpretation of tax provisions which grant deductions for charitable bequests was addressed by the Supreme Court in the context of the Revenue Act of 1918, 40 Stat. c. 18, Title IV, which established an estate tax deduction for such bequests. Edwards v. Slocum, 264 U.S. 61, 44 S.Ct. 293, 68 L.Ed. 564 (1924). In Edwards, the Court closely examined the language of the applicable estate tax statute to determine whether the deduction for a residuary charitable gift had to be reduced by the amount to be diverted for the payment of taxes. The Court concluded that the specific language of the statute compelled the conclusion that no such reduction was required and noted that:
 
 
 30
 The Government offers an algebraic formula by which it would solve the problems raised by two mutually dependent indeterminates. It fairly might be answered ... that "algebraic formulae are not lightly to be imputed to legislators," but it appears to us that the structure of [this] statute is sufficient to exclude the imputation.
 
 
 31
 Id. at 63, 44 S.Ct. at 293.
 
 
 32
 The government addresses this precedent by noting that shortly after the Edwards decision Congress demonstrated its displeasure with the result by modifying the language of the estate tax charitable deduction statute. Congress modified the estate tax code to require any such deduction to be reduced to reflect the portion of the fund actually used to pay estate taxes, although initially set aside for charitable purposes under the governing instrument. See Revenue Act of 1924, ch. 234, 43 Stat. 253, Sec. 303(a)(3). The government relies upon this subsequent legislative action in urging its position herein.
 
 
 33
 However, as the government's own citation suggests, the Congressional intent in this regard has not been so broad and unfaltering as to support the conclusion that the interpretation of the legislative intent embodied in the Revenue Act of 1918 was incorrect in Edwards:
 
 
 34
 The 1924 provision overruling Edwards v. Slocum was eliminated in 1926, but was restored in the Revenue Act of 1932, ch. 209, Sec 807, 47 Stat. 69, as an amendment to the Revenue Act of 1926. See S.Rep. No. 665, 72d Cong., 1st Sess. at 52 (1939-1 Cum.Bull. (Pt. 2) 496, 537). An equivalent provision has been part of the estate tax ever since. See Sec. 812(d) of the 1939 Code and Sec. 2055(c) of the 1954 Code.
 
 
 35
 Government's Brief at p. 29 n. 11.
 
 
 36
 More importantly, the government provides little authority for its "basic principle of taxation" except citation to cases which principally address post-Edwards estate tax law. See, e.g., Commissioner v. Estate of Sternberger, 348 U.S. 187, 197-98, 75 S.Ct. 229, 234-35, 99 L.Ed. 246 (1955) (disallowing estate tax deduction for bequest which was conditional under the terms of the will); Harrison v. Northern Trust Co., 317 U.S. 476, 480, 63 S.Ct. 361, 363, 87 L.Ed. 407 (1943) (limiting the amount of the federal estate tax deduction for charitable residuary bequest to amounts actually passing to the charitable beneficiaries after provision for taxes under Sec. 303(a) of the Revenue Act of 1926); Irving Trust Co. v. United States, 221 F.2d 303, 306 (2d Cir.1955) (estate tax deduction only available for amounts actually received by the charity); Estate of Thompson v. Commissioner, 123 F.2d 816, 818 (2d Cir.1941) (estate tax charitable deduction initially paid to charities reduced by amount subsequently paid to decedent's next of kin in settlement of objections to probate); Ahmanson Foundation v. United States, 674 F.2d 761, 762 (9th Cir.1981) (reversing in part an estate tax refund). The other cases cited by the government concern income tax law in situations where the funds were found not to have been permanently set aside under the terms of the governing instrument. See, e.g., Estate of Wright v. United States, 677 F.2d 53 (9th Cir.1982) (income not "permanently set aside" where contest ultimately resulted in partial distribution to noncharitable beneficiary and deduction under Sec. 642(c) reduced by that amount); Estate of Freund v. Commissioner, 303 F.2d 30, 32 (2d Cir.1962) (income not actually received by the estate found not to have been "permanently set aside" under Sec. 642(c) ); Estate of Luehrmann v. Commissioner, 287 F.2d 10, 13-15 (8th Cir.1961) (denying income tax deduction where it appeared that amounts claimed as charitable deductions were in fact expended for purposes of administration). Rather than providing evidence of some broad principle of taxation, these cases simply give application to the text of the applicable legislation.
 
 
 37
 We conclude that Congress knew that the algebraic formula for calculations would not be used unless expressly provided for by statute and that by limiting its amendment to Sec. 2055 it did not contemplate that the formula would be applied under other statutes such as Sec. 642(c). Moreover, its limited authorization of the formula is in keeping with the countervailing policy in favor of a liberal construction of statutes authorizing deductions for charitable contributions, Helvering v. Bliss, 293 U.S. 144, 150-51, 55 S.Ct. 17, 20-21, 79 L.Ed. 246 (1934), so that people will be encouraged to make such contributions. Commissioner v. Estate of Sternberger, 348 U.S. 187, 198-99, 75 S.Ct. 229, 235, 99 L.Ed.2d 246 (1955); United States v. Benedict, 338 U.S. 692, 696-97, 70 S.Ct. 472, 475-76, 94 L.Ed.2d 478 (1950).
 
 
 38
 Even if the government is correct in its view of Congress' intent regarding the calculation of the charitable deduction for estate tax purposes, such does not logically require the further conclusion that Congress devised the same formula for estate income tax purposes. We can discern two reasons that support a principled distinction between the tax calculation for estate taxes and estate income taxes. First, the size of the estate in all but the rarest instances ordinarily exceeds that of the income it receives. The facts of the present case bear this out. Ms. Dewar left an estate worth approximately $49 million. In contrast, her estate received approximately $3.5 million in income following her death. Thus, the income tax lost to the collector by the use of the "straight-line" formula will usually be small compared to the amount that would be lost were the straight-line method applied in calculating the charitable deduction for the estate tax. The facts in Edwards illustrate this proposition. There the decedent's estate was worth $49 million, and the executors claimed a charitable deduction of $35 million. See 264 U.S. at 62, 44 S.Ct. at 293. By way of contrast, here the charitable deduction claimed is $1.4 million.
 
 
 39
 Of course, it is possible that by our holding the deduction received for the same amount of a bequest might differ depending on whether the money or property was drawn from the estate or the estate's income. Although not confined to this situation, the second reason for distinguishing the treatment of the charitable deduction directly addresses it. Most testators carefully plan their dispositions either to eliminate or minimize the burden of the estate tax. The testator, with the aid of experienced counsel, is usually aware of the value of his or her assets, their intended dispositions, and the tax consequences of those dispositions. Such careful planning is not possible with respect to an attempt to minimize the tax burden on the estate's income. All that a testator knows is the intended disposition of that income; the amount available is unknown, especially in light of the various uncertainties attendant upon the administration of an estate. See 2 W. Bowe & D. Parker, Page on Wills Sec. 18.19, at 20-21 (4th ed. 1960). Such uncertainties may generate substantial administrative expenses, further depleting the amount earmarked for the charity. Indeed, the facts of the present case attest to this--estate administration consumed nearly one third of the income generated by the corpus.
 
 
 40
 Recognition of these difficulties may reasonably justify the difference in the calculation of the charitable deduction. This case itself suggests why Congress has not changed the estate income tax provision to parallel its estate tax counterpart. If we were to adopt the government's suggested formula, the charities that Ms. Dewar intended to benefit would receive nothing. As noted, after paying administrative expenses, the estate had $1.4 million in cash to meet its tax liability and to make the charitable donations. Adopting the government's position would set the estate's income tax liability at approximately $1.7 million, completely adeeming the charitable bequests.
 
 
 41
 Therefore, based upon what appears to us to be the clear language of the statute and in light of the dearth of authority supporting any contrary principle of taxation, we affirm the judgment of the district court.
 
 
 
 [1]
 The court's decree of December 30, 1978 stated in pertinent part:
 ... the Co-executors ... are discharged as to said accounts as they have herein been judicially settled and allowed; except that said Co-executors are not herein finally discharged as to the revision as set forth in the decision of this Court dated December 28, 1978, concerning said fiduciary tax returns and the Co-executors are hereby directed within a reasonable time to file Amended Federal and New York State Fiduciary Income Tax Returns, to reflect the decision of this court and thereafter file with this Court a Supplemental Account with respect to said filing of these amended fiduciary income tax returns....
 
 
 [2]
 The "interrelated computation," which was proposed by the government is so described because it provides a mathematical solution to problems involving two unknown but related variables. A more intuitive approach to such problems utilizes an iterative calculation which approximates the result of the "interrelated computation" through successive calculations. See n. 5, infra
 
 
 [3]
 The so called "straight deduction" allows the estate to take a deduction under Sec. 642(c) for the entire amount which has been "permanently set aside" for charitable purposes without considering income taxes to be extracted from the estate. Therefore, under the "straight deduction" method a portion of the residue would actually reach the charities while a portion would be used to pay the estate's income taxes, but the deduction would not reflect any such diversion
 
 
 [4]
 The agency's contention that appellees could not rely upon Revenue Ruling 73-366, 1973-2 C.B. 408 because the executors of the estate had not rendered a "final accounting" or been "discharged" within the meaning of that Ruling must be rejected. Under New York law, which governs since the estate was administered by a New York court (Surrogate's Court of Otsego County), cf. Westerweller v. Commissioner, 17 T.C. 1532, 1534-38 (1952) (state law determines whether person is "fiduciary" capable of filing return on behalf of the estate), the Surrogate Court's decree is the "final" resolution of the accounts embraced by the decree, In re Grace's Estate, 62 Misc.2d 51, 308 N.Y.S.2d 33, 40 (Sur.Ct.1970), aff'd mem., 35 A.D.2d 783, 315 N.Y.S.2d 816 (1971), and is no less "final" simply because other aspects of the estate remain unsettled. Id.; In re Jones' Will, 13 Misc. 2d 678, 177 N.Y.S.2d 307 (Sur.Ct.1958), aff'd, 8 A.D.2d 829, 190 N.Y.S.2d 166 (1959); In re Crawford's Will, 207 Misc. 145, 136 N.Y.S.2d 716, 720 (Sur.Ct.1955); In re Blake's Will, 46 N.Y.S.2d 549 (Sur.Ct.1943). The executor is considered to have been discharged with respect to the accounts settled by the decree. Jandorf v. Smith, 217 A.D. 150, 155, 217 N.Y.S. 145 (1926); Rosen v. Ward, 96 A.D. 262, 266-67 (1904). There was therefore no danger that the IRS would have to deal with different beneficiaries simultaneously taking conflicting positions with respect to requests for refunds
 
 
 [5]
 Since at least $700,000 must be used to pay the tax on the non-deductible administrative expenses and by applying the principle that the deduction must not include money used or to be used to pay taxes, the resulting deduction could not exceed the $700,000 remaining in the estate after taxes are paid. However, under the government's theory, since the deductions must be reduced from $1.4 million to $700,000 an addition of $700,000 of taxable income would be exposed. This results in $490,000 additional tax to be paid, 70% of the newly exposed income. Therefore, since the deduction cannot include money needed to pay this additional tax liability, the resulting deduction could not exceed $310,000. Finally, this deduction in the actual charitable donation would expose another $490,000 of income to taxation and result in the total elimination of any charitable deduction